## Roberts' and Pyne's Appeal.

1. The Act of January 11th 1867, authorizing mining, &c., companies to mortgage their "property" for loans, does not authorize a mortgage of chattels.

2. Chattel mortgages and sales leaving the property with the debtor are against policy, and void as to execution creditors.

January 21st 1869.    Before THOMPSON, C. J., AGNEW and SHARSWOOD, JJ.  READ, J., absent.  WILLIAMS, J., at Nisi Prius.

Appeal from the decree of the Court of Common Pleas of *Schuylkill county :* Of January Term 1869, No. 306.

The decree in this case was made in the distribution of the proceeds of the sheriff's sale of the personal property of the New York and Schuylkill Coal Company under a number of writs of fieri facias.

The defendants in the executions are a corporation created under the laws of Pennsylvania having a right to hold coal-lands and possessing mining privileges.  The Act of January 11th 1867, § 1, Pamph. L. 1373, Purd. 1469, pl. 7, provides, "That all iron and other manufacturing and mining corporations incorporated under the laws of this Commonwealth shall be and hereby are enabled to borrow moneys and secure the loan to be made to them by mortgage of their property, and to dispose of their bonds or certificates of loan or pay interest thereon, at such rates as railroad and canal companies may now do."

Under the authority of this act the New York and Schuylkill Company, on the 1st of April 1867, made a mortgage to Marshall O. Roberts and Perry R. Pyne, who are the appellants in this case, as trustees, to secure 350 bonds of different denominations to the aggregate amount of $250,000, the company needing and having resolved to borrow that amount of money to carry out the objects of their incorporation : the mortgage to be for the benefit of all persons or bodies corporate who should become the holders of their bonds.

The mortgage was of all their lands, tenements, hereditaments and real estate situate, &c., lying and being in the county of Schuylkill, and state of Pennsylvania, and all other lands, tenements, hereditaments and real estate of the said parties whatsoever and wheresoever the same may be: together with all and singular the coal-mines, coal-mining rights, minerals, ways, waters, watercourses, rights, liberties, privileges, improvements and appertenances, situate upon or belonging, or in anywise appertaining unto the said lands, &c.,    *    *    and also all and singular the mining fixtures and improvements, railways, mine tracks, roads, bridges, edifices, buildings, structures, and all other improvements whatsoever, which heretofore have been or hereafter

[Roberts' and Pyne's Appeal.]

shall or may be erected, placed, made, opened or constructed in or upon the said premises or any part thereof; and also all the estate, right, &c., * * and also all of the tools, implements, carts, horses, mules, tracks and other personal property and effects upon the said lands, tenements and real estate, and used or employed by the said parties of the first part in or about or in connection with the business of mining, preparing and moving coal thereon." * *

"Subject nevertheless to the possession, use and enjoyment by the said parties of the first part of the said premises, and the tolls, rents, issues and profits thereof, with the right of mining coal thereon, so long as the said parties of the first part shall well and faithfully perform and fulfil all and singular the stipulations and agreements contained in the said several bonds," &c.

Barnhart & Koch and other creditors obtained judgments against the company and levied on a large amount of store goods in their storehouses at Forestville and Thomaston; and lumber, timber, iron, machinery, &c., at their mines.

The proceeds of the executions, all having come from sales of personal property, amounting to $30,256.89, were paid into court. The fund was referred to G. E. Farquhar, Esq., as auditor, for distribution. The claimants on the fund were for labor, for timber furnished for mining purposes, the execution-creditors, &c. The trustees under the mortgage claimed to take the whole fund, alleging that all the defendants' personal property was bound by the mortgage. The auditor decided that the Act of Assembly of January 11th 1867 did not authorize a mortgage to create a lien on personal property, and that the trustees consequently had no claim on the fund. He distributed it, therefore, amongst other creditors.

The trustees excepted to the report of the auditor; the exceptions were overruled by the Court of Common Pleas and the report confirmed. The trustees appealed from the decree of confirmation and assigned for error that the court did not award to them the whole fund.

*F. W. Hughes*, for appellants.—Corporations have the right to dispose of their property independently of positive law: Bank of Kentucky *v.* Schuylkill Bank, 1 Parsons 225; Gordon *v.* Preston, 1 Watts 385; McMasters *v.* Reed, 1 Grant 36. He referred also to numerous Acts of Assembly authorizing corporations to mortgage their personal property as indicating the same intent as the Act of 1867.

*J. W. Ryan* and *B. W. Cummings*, for the appellees.—Chattel mortgages are discountenanced as in derogation of the common law and against public policy: Summerville *v.* Wann, 1 Wright

10 P. F. SMITH—26

[Roberts' and Pyne's Appeal.]

184.   Property, in the Act of 1867, means real estate: Stoever *v.* Stoever, 9 S. & R. 445; Foster *v.* Stewart, 6 Harris 23.   Such statutes must be construed strictly and not carried beyond their very words: Esterley's Appeal, 4 P. F. Smith 192; Packer *v.* The Sunbury and Erie Railroad Co., 7 Harris 211; Billings *v.* The Providence Bank, 4 Peters 514; The Charles River Bridge *v.* The Warren Bridge, 11 Id. 521.   A corporation takes nothing by construction: Commonwealth *v.* Erie and N. E. Railroad, 3 Casey 339; Gildart *v.* Gladstone, 11 East 685; Scales *v.* Pickering, 4 Bingham 452; Wolf *v.* Goddard, 9 Watts 550.   The description of the property in the mortgage is too vague: Garber *v.* Henry, 6 Watts 59.   Delivery is necessary in a mortgage of goods: Clow *v.* Woods, 5 S. & R. 275; Welsh *v.* Bekey, 1 Penna. R. 57; Fry *v.* Miller, 9 Wright 441; Portland Bank *v.* Stubbs, 6 Mass. 422–425; Gale *v.* Ward, 14 Id. 352; Tucker *v.* Buffington, 15 Id. 477; Badlam *v.* Tucker, 1 Pick. 389; Bonsey *v.* Amee, 8 Id. 236; Bullock *v.* Williams, 16 Id. 33; Gardner *v.* Adams, 12 Wend. 297; Murry *v.* Burtis, 15 Id. 212; Look *v.* Comstock, Id. 244; Russel *v.* Winne, 37 N. Y. 591.

The opinion of the court was delivered, February 4th 1869, by AGNEW, J.—The Act of 11th January 1867, entitled " An Act to enable Manufacturing and Mining Corporations to borrow money," consists of a single section, and provides, " That all iron and other manufacturing and mining corporations, incorporated under the laws of this Commonwealth, shall be and are hereby enabled to borrow moneys, and to secure the loans to be made to them by mortgage of their property, and to dispose of their bonds or certificates of loan, or pay interest thereon, at such rates as railroad and canal companies may now do."   The question presented is, whether this act intended to embrace a mortgage of *chattels* in the term property, or only such property as had been usually mortgaged before the time of its passage.   It is said the act is an enabling act.   This is so, but was its purpose to enable these companies to mortgage their *personal* property, or was it to enable them to *dispose* of their bonds or pay *interest* thereon, *at such rates* as railroad and canal companies can now do?   If the former purpose had been distinctly in the mind of the penman of the act, it is strange he did not say so in clear and apt language, considering it to be the introduction of a novelty into the laws of mortgage, unwarranted by any former policy of the state.   It is true railroad companies have been authorized to do this, and other corporations in similar circumstances, whose personal interests have been of such a permanent and fixed character, or so incapable of removal, that no inconvenience would be felt in relaxing the general rule as to movables.   But in this act the term property is so wholly unexplained by its context that it may or may not refer

to chattels, and it leaves the mind to hesitate and doubt whether the legislature meant more than the property accustomed to be mortgaged under the laws of the state, and for which provision was made for notice by recording, and remedy by scire facias. But the intent to facilitate the borrowing of money at unusual rates of interest, is clearly expressed, the power being to dispose of their bonds, or to pay interest thereon at such rates as railroad and canal companies may now do. Having then one clear and useful purpose plainly in view to satisfy the language of the act, and another which is extremely doubtful, we must look to the reason bearing upon the interpretation to determine what meaning shall be given to the word property. If we give the term its full scope, it will embrace, as the sheriff's levy actually did, an infinite variety of goods in a store, kept purposely for sale to laborers at the mines, and to the country side, and thus we should have the lien of the mortgage sailing out after every spool of cotton, paper of pins, hat or cap, and the notions on twenty-two shelves stated in the sheriff's levy. But if the absurdity of such a roaming lien should compel us to contract the meaning of the word, at what boundary shall we stop? What warrant have we to say it shall only embrace houses, mules, and the tools and implements of labor in the mines? And if we should say the sheriff will not be sent in the foolish pursuit of property or merchandise taken or sold off the premises, of what use would be the power to mortgage the personalty? Chattel mortgages and sales which leave the property in possession of the debtor, are against policy and void against execution-creditors. Then what evidence have we in the act itself that it was the intention of the legislature to uproot this ancient and wise policy? Certainly none, but the use of a word of wide meaning, and which might have been readily used in reference to a kind of property in the mind of the penman which was the common subject of mortgages. On the other hand, the omissions of the act tell strongly against the wide meaning asked for it. There is no provision for recording such a mortgage, or for a remedy upon it. It is not a good argument to say the recording of the mortgage as to the realty would carry the personalty with it. That, however, supposes that every mortgage will consist of realty as well as of personalty. But if property mean chattels, it would be as competent to mortgage personalty only as both realty and personalty. Certainly the legislature did not mean that an unrecorded chattel mortgage should be kept in the pocket of one creditor to be sprung upon others when it might suit his interests to let it go. Upon a view of the whole case we do not think it was meant by the term property to cover any other kinds than those which the law made capable of being mortgaged by such corporations.

Judgment affirmed.